UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MARCUS THORPE,

                    Plaintiff,

     -against-

CITY OF NEW YORK, NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION, NEW YORK
CITY POLICE DEPARTMENT, HARLEM HOSPITAL,
NYCHHC POLICE OFFICER FRANCIS SENAJOR,
SHIELD #435, NYCHHC POLICE OFFICER
JONATHAN CARDONA, NYCHHC LIEUTENANT
THERESA BRITTO and NYCHHC SERGEANT
TYRONE JOSEPH,

                    Defendant(s).
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/21

19-CV-5995 (CM)(RWL)

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

McMahon, J.:

    Plaintiff, Marcus Thorpe, brings this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §§ 1981, 1983, 1985, and New York state law, stemming from his arrest on April 12, 2018, at Harlem Hospital.  The arrest was prompted by a physical altercation that left both plaintiff and defendant Francis Senajor ("Officer Senajor")—an officer with the New York City Health and Hospitals Corporation (NYCHHC) police—with injuries.

    In Plaintiff's Second Amended Complaint ("SAC"), filed January 8, 2020, he pleads claims for negligence, excessive force, failure to intervene, assault and battery, malicious prosecution, conspiracy, and false arrest against Officer Senajor, NYCHHC Special Officer Jonathan Cardona ("Officer Cardona"), and former NYCHHC Lieutenant Theresa Britto ("Lieutenant Britto"), under

both federal and state law.[1] Additionally, Plaintiff asserts a claim for negligence and a purported claim for municipal liability (failure to train and supervise) under federal and state law against Defendants City of New York ("City"), New York City Health and Hospital Corporation, Harlem Hospital, and the New York City Police Department ("NYPD").

Defendants have moved for partial summary judgment dismissing certain claims alleged in the SAC. For the reasons outlined below, the motion is GRANTED in part and DENIED in part.

## STATEMENT OF FACTS

As required on a motion for summary judgment, the following statement of facts is most favorable to the non-moving party, the plaintiff. The following facts are undisputed unless otherwise noted.

On April 12, 2018, at approximately 1:49 a.m., Officer Senajor and Sergeant Joseph of the Harlem Hospital Police were dispatched by the Police Command Center to conduct a visitor sweep of the 11th floor. They were sent in response to a request for assistance from the hospital's nursing staff, who reported to the police that a visitor was lying in a patient's bed with his pants halfway down, and being verbally aggressive towards the nursing staff when told to get out of the patient's bed. (Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("56.1") at ¶¶ 1-2, 7-8).[2]

---

[1] The status of another defendant, Sgt. Joseph, is unclear to the court. He was named in the original complaint, not named in the First Amended Complaint, and named again in the Second Amended Complaint. He was served long after the other defendants. He was at one time represented by the Corporation Counsel and was supposed to file an answer on March 31, 2020– a date suspended as a result of the pandemic. There is no indication that he has ever filed an answer or otherwise participated in this litigation. The motion for partial summary judgment was not filed by Corporation Counsel on his behalf. The parties should address his status at some point.

[2] This assertion of undisputed fact is accepted, not for the truth of the matter, but for the fact that this information was reported to the Harlem Hospital Police, which is undisputed. Plaintiff denies that he was doing what was described to the police. But what plaintiff was or was not doing in his girlfriend's hospital room in the middle of the night is not material to any issue raised by the complaint; the only relevant fact is that the police were called to come to the hospital room after visiting hours and they found plaintiff there.

Upon arriving on the 11th floor, Officer Senajor and Sergeant Joseph spoke with the head nurse at the nurse's station. They then entered Room 11-121—a hospital room shared by more than one patient—and observed Plaintiff in the room, where he was with a patient named Mildred Diaz. (Id. at ¶¶ 9-10). There does not seem to be any dispute that, at the time the officers entered the room, the Plaintiff was seated in a chair, not lying on Ms. Diaz' bed.

The officers contend that they spoke to the patient, who said she wanted "that mother.....er" out of her room. (Senajor EBT, Iheanachor Aff. Ex. D at 25). Officer Senajor and Sergeant Joseph told plaintiff that he had to leave Ms. Diaz's hospital room because visiting hours were over. (Id. at ¶ 11).

Plaintiff eventually left the hospital room with the officers and began walking towards the 11th floor elevator bank, where they entered an elevator[3] that took them straight to the ground floor without stopping. (Id. at ¶ 12, 14). During this journey it is the officers' position that the plaintiff was yelling at them and they were trying to calm him. (Id. at ¶ 13, 15). Plaintiff takes the view that Officer Senajor was behaving toward him in a threatening manner, and the Sergeant was trying to calm his colleague down. A surveillance video taken during the elevator ride (Iheanachor Ex. K) shows that plaintiff appears to be directing unfriendly comments toward Officer Senajor during the elevator ride, and that, at about 28 seconds into a 51 second video, Senajor took out something—a baton or flashlight, it is not clear—and pointed it toward plaintiff (without touching him). At that point, Sergeant Joseph put up his right hand in what appears to be a "calm down" gesture, though to whom the gesture was directed (Senajor or Plaintiff) is not clear. It appears that Plaintiff continued to direct comments toward Senajor, and then toward the Sergeant, both of whom ignored him until the elevator doors opened.

---

[3] According to Officer Senajor, plaintiff was reluctant to leave; two elevator cars came and went before he finally entered the third car that arrived. (Senajor EBT, Iheanachor Ex. D, at 28).

Once the elevator reached the ground floor, Plaintiff, Officer Senajor, and Sergeant Joseph left the elevator— Plaintiff going first, followed by Officer Senajor on the right and Sergeant Joseph on the left. (Id. at ¶ 16). The elevator surveillance video shows that, as the three men walk away, plaintiff was walking backward, facing the officers and directing comments toward them in what appears to be a hostile manner (unfortunately there is only video, no audio). In this regard, it is notable that the Plaintiff himself testified that he was "irate," "extremely upset," and "pretty hot" during the incident, and that he admitted to yelling at Sergeant Joseph. See 56.1, at ¶ 13. It is the position of the police officers that Plaintiff, who was about one arm's length from Officer Senajor, was shouting obscenities. (Id. at ¶¶ 21-22).

There followed a physical altercation between Officer Senajor and Plaintiff. (Id. ¶ 23)

Plaintiff says that he "believes" Senajor "pushed him one more time" as he was being ushered toward the hospital exit, whereupon Plaintiff turned around to tell Senajor, "The next time you see me, you need to keep your hands to yourself." Before he could get the words out, Senajor allegedly struck Plaintiff in the eye with a baton and everything went black. (Thorpe Deposition at 26). According to the officers, Plaintiff head butted Senajor, who defended himself with his baton and admittedly hit the plaintiff with it. (Senajor Deposition at 39:4-20; 90:8-22).

Unfortunately, the lobby video camera (Iheanachor Ex. L)—which captures the elevator waiting area and the lobby in the distance—does not resolve the factual dispute. The video shows Thorpe back-peddling out of the elevator area with Sergeant Joseph and Officer Senajor walking slowly behind him, in the direction of the exit. (Plaintiff Exhibit K, Lobby Video at 16:40:25). They walk by Officer Cardona, who was stationed at a podium-style security desk at the place where the elevator bank opens into the lobby. Cardona testified that he remained at his post until after the physical altercation described above. However, on the video it appears that Cardona immediately

4

got out of his chair, reached behind his back, and joined the procession that was making its way toward the lobby door.

At 16:40:33 on the video, Thorpe was still back peddling in the direction of the lobby door, but now with the police officers—Joseph, Senajor and Cardona—following slowly behind. It is hard to tell from the poor-quality video—which records in jumpy, two second intervals—whether Thorpe is "lunging with his head" at the officers, as they allege. It is also hard to tell the officers apart once they come together with their blue-uniformed backs to the camera. At 16:40:43, one of the officers (perhaps Cardona) turns away from the action and walks toward Cardona's assigned post near the elevator. At 16:40:49, that same officer turned his head to look back at Thorpe, Joseph and Senajor, and immediately walked back over to join his fellow officers. By 16:40:53, the men appear as a tight scrum—the officers' blue-uniformed backs to the camera, totally obscuring Thorpe. At 16:41:19, one officer stepped backward and the other officers come together, with Thorpe in front of them; Thorpe, again, cannot be seen on video. But seconds later, at 16:41:23, Thorpe was lying on his back on the lobby floor.

One of the officers (it is impossible for me to tell which one) remained with Thorpe while the other two officers scramble around. At 16:42:03 on the video, Thorpe can be seen sitting on the floor leaning against a pillar, in a manner consistent with a person in handcuffs. Medical staff and other officers arrived on the scene quickly; by 16:46:19 Thorpe was in a wheelchair, hands behind his back, being wheeled into the elevator. At 16:46:20, the elevator/lobby area was empty except for a lone sentry at Cardona's elevator-podium post.

Both Officer Senajor and Plaintiff were taken to the Harlem Hospital Emergency Room, where they received treatment. While in the ER, Cardona saw that one side of Senajor's face was red and swollen. (Cardona EBT 48-50). Plaintiff 's eye was injured to the extent that he remained

5

in the hospital for several days, awaiting a specific surgeon to remove the sutures from his eye. Plaintiff's. Br. In Opp. at 5.   Upon his release from the hospital, Plaintiff was taken to Central Booking by Cardona.

Lieutenant Britto was not present for the incidents that led to Plaintiff's arrest. (See 56.1 at ¶¶ 46-48). She learned of the arrest *via* a radio notification from central command at approximately 2:00 a.m. (Id. at ¶ 31). She then went to the emergency room to check on Officer Senajor. (Id. at ¶ 33). In the emergency room, she observed that Officer Senajor's face appeared swollen. (Id.)

While in the emergency room, Lieutenant Britto gave Officer Cardona the paperwork he needed to fill out to process Plaintiff's arrest. She later reviewed the paperwork for completeness and provided administrative approval. (Id. at ¶ 34)

In addition to serving as the official arresting officer and filling out the arrest paperwork, Officer Cardona signed the criminal complaint pertaining to Plaintiff's arrest. (Id. at ¶ 35).  On April 14, 2018, Plaintiff was arraigned in New York County Criminal Court on one count of Assault in the Second Degree, in violation of Penal Law §120.05(3)[4] (Id. at ¶ 37).

At the time of his arrest, Plaintiff was on parole for Attempted Criminal Possession of a Weapon in the Second Degree. As a condition of his parole, he was subject to a curfew restriction. (Id. at ¶¶ 38-39). When Plaintiff was found at Harlem Hospital, he was out after curfew. (Id. at ¶ 40). Lieutenant Britto reported the incident to Plaintiff's parole officer and a parole warrant issued. After his arraignment Plaintiff was transferred into the custody of the New York City Department of Correction (NYCDOC). (Id. at ¶ 41).  He was reincarcerated pending a parole violation hearing. (Id. at ¶ 45).

---

[4] The relevant elements of Assault in the Second Degree (N.Y. Penal Law 120.05(3)) is that, with intent to prevent a peace officer or other designated official from doing his/her job, the defendant causes physical injury to the police officer. Unlike assault in the second degree on a civilian, the attack does not need to result in "serious physical injury."

A preliminary parole hearing was held on April 23, 2018. Although a total of eight possible parole violations were lodged against plaintiff, the hearing focused on the charge that he assaulted a police officer. (Iheanachor Exhibit O – P.P.H Minutes at pp. 4-5). Officer Senajor testified at the preliminary parole hearing; he admitted hitting Plaintiff, but claimed it was in self defense. (Id. at 9) Plaintiff also testified at the hearing (Id. at 20-24); he claimed that he immediately cooperated when told to leave but was nonetheless pushed several times by the officers; that there was no incident during the elevator ride; that he was pushed one last time in the lobby, whereupon he said, "You need to keep your hands to yourself;" that Senajor then hit him with a baton, without provocation; and that he, Thorpe, never hit a police officer and would not have done so, since he was aware that he was out in violation of the terms of his parole.

After listening to the testimony, the Parole Hearing Officer found, "probable cause that plaintiff violated one or more of his conditions of his release in an important respect" by assaulting a police officer. A final hearing was scheduled for May 3, 2018. (Id. at 27:2-11).

There is no evidence that the final hearing was ever held. Plaintiff, who ultimately received a parole violation for violating curfew (which he effectively admitted in his testimony), was incarcerated for a total of six months. His parole hold was lifted on November 9, 2018. (Exhibit "2"; Pl. Dep. 59:22-25; 80: 18-20; D Undisputed Facts at ¶ 45).

As a result of the parole hold, Plaintiff was ineligible for bail on his assault arrest.

On October 12, 2018, the criminal prosecution against Plaintiff was dismissed on speedy trial grounds. (Id. at ¶ 44).

This lawsuit was filed on June 26, 2019. The motion for partial summary judgment was filed after the filing of the Second Amended Complaint.

## DISCUSSION

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. United States Veterans Admin., 870 F. 2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industries Co., 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

The motion for partial summary judgment is disposed of as follows:

1. **ALL CLAIMS AGAINST THE NYPD AND HARLEM HOSPITAL ARE DISMISSED BECAUSE THEY ARE NOT SUABLE ENTITIES**

Plaintiff names the New York City Police Department and Harlem Hospital as defendants. However, pursuant to § 396 of the New York Charter, "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." Jenkins v. City of New York, 478 F.3d 76 (2d Cir. 2007) (dismissing NYPD as a "non-suable agency" of the City of New York). Further, courts of this circuit have concluded that "'operating division[s]' of the New York City Health and Hospitals Corporation ("HHC") are 'not...separate entit[ies]' from HHC and should not be independently 'subject to suit." Powell v. N.Y. City Police Dep't, 2020 U.S. Dist. LEXIS 157970, *7 (E.D.N.Y. Aug. 31, 2020) (quoting Ingrassia v. Health & Hostp. Corp., 130 F. Supp. 3d 709, 716 (E.D.N.Y. 2015) (dismissing an operating division of HHC from an action in which HHC was also named).

Accordingly, the motion for summary judgment is granted to the extent of dismissing all claims against the NYPD and Harlem Hospital.

2. **DEFENDANTS SENAJOR AND BRITTO BUT NOT CARDONA ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIM FOR FALSE ARREST**

Plaintiff alleges that he was unlawfully arrested on April 12, 2018. (SAC, Tenth Cause of Action). He asserts false arrest claims against Lt. Britto and Officers Cardona and Senajor.[5]

---

[5] Plaintiff also asserts a false arrest claim against Sgt. Joseph, but as noted above, his status in this lawsuit is unclear, and the motion for partial summary judgment was not filed on his behalf.

To state a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).

"The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (quoting Bernard, 25 F.3d at 102).

"Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. Id. Additionally, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) (citing Devenpeck v. Alford, 543 U.S. 146 (2004)).

Defendants assert that there was probable cause to arrest Plaintiff for disorderly conduct. Under New York Penal Law § 240.20(1), 'A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof,' he: (1) 'engages in fighting or in violent, tumultuous or threatening behavior." Hughes v. Lebron, 2016 U.S. Dist. LEXIS 127569, *20 (S.D.N.Y. Sept. 19, 2016). The conduct of the offender must be "public in nature" and "become a potential or immediate public problem." Id. (quoting Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001); see also People v. Munafo, 50 N.Y.2d 326, 331 (1980).

In determining whether the conduct is public in nature, "the Court should 'employ[] a contextual analysis that turns on consideration of many factors including 'the time and place of the episode under scrutiny; the nature and character of the conduct;…and any other relevant

10

circumstances.'" Hughes, 2016 U.S. Dist. LEXIS 127569 at *20 (quoting People v. Baker, 20 N.Y.3d 354, 360 (2013)). Further, "a defendant may be guilty of disorderly conduct regardless of whether the action results in public inconvenience, annoyance or alarm", as long as the conduct "recklessly creates a risk of such public disruption." Id. (quoting People v. Weaver, 16 N.Y.3d 123, 128 (2011)).

Here, the underlying incident occurred in a New York City hospital at approximately 2:00 a.m. Plaintiff, by his own account, was "irate," "extremely upset," and "pretty hot" as he and the officers walked the hallway from his girlfriend's hospital room to the 11th floor elevator bank. See 56.1, at ¶ 13. Plaintiff further admits to yelling at Sergeant Joseph during the course of the underlying incident. Id. And he continued his verbal assault as they walked toward the door; in fact, Plaintiff was walking backward so that he could address himself directly to the two policemen, who were walking behind him. All this is confirmed by evidence from surveillance video cameras in both the elevator and the lobby, which shows Plaintiff directing comments toward the officers in what appears to be an agitated and hostile manner. (See Ileanachor Exhibits K, L. 56.1 at ¶ 15). Unfortunately, there is no soundtrack on the video, so Plaintiff's words cannot be understood; nor can his volume be ascertained from the videos.

Plaintiff argues that there are disputed issues of fact concerning exactly what went on in the lobby, and whether he was in fact creating a ruckus that might have warranted his arrest for disorderly conduct. I agree. He tells a very different story from the officers and it is impossible to resolve any discrepancies by resort to a surveillance video that lacks sound.

Plaintiff also argues that his admitted dispute with Senajor was "private" and so did not rise to the level of public inconvenience, annoyance or alarm that gives rise to probable cause for a disorderly conduct arrest. Of course, even a "private" dispute, when carried out in a public place,

can create a risk of public disruption, and actual disruption is not required before there exists probable cause to arrest on a disorderly conduct charge. It is certainly possible that engaging in aggressive behavior in the lobby of a public hospital in the middle of the night gave rise to grounds to arrest for disorderly conduct.

However, case law suggests that whether conduct risks giving rise to "public inconvenience, annoyance or alarm" is a fact-intensive question. In determining the issue courts (and juries) are to consider factors such as: (1) number of those attracted to the scene; (2) the surrounding circumstances of the dispute, and (3) the time and place of the incident. People v. Munafo, 50 N.Y.2d 326, 331-332 (1980). It is critical that an individual's statements and behavior are of a public rather than an individual dimension for said behavior to constitute as disorderly conduct. People v. Baker, 20 N.Y.3d 354, 359 (2013).

The "public harm" element of the disorderly conduct statute, "performs an important narrowing function" that serves to distinguish it from those other offenses, such as menacing and harassment, which are meant to address altercations of a personal nature. People v. Baker, at 362. In Baker, the defendant yelled obscenities directed at a police officer on a public street which caused a, "group of bystanders to gather," to watch the defendant's encounter with the police. The New York Court of Appeals determined that the defendant's arrest in Baker for disorderly conduct was not based on probable cause, because there was "no record basis" for finding the "public harm element." Id. at 362. In Baker, although the defendant caused people to gather to watch the defendant's encounter with the police, the Court still found that the "public harm" element was insufficient. Id. at 357; People v. Ferguson, 22 N.Y.S.3d 138 (N.Y. Crim. Ct. 2015). Further, in Munafo, the same court concluded that there was no probable cause to arrest for disorderly conduct—even though there were bystanders who watched the

encounter—because, "Those present were small in number," and the defendant did not try to incite them or encourage them to assist him. People v. Munafo at 332. In Ferguson, in which the defendant was seen yelling at another person on a street in Upper Manhattan where five (5) people stopped and stared, the Court found that the defendant's "yelling" was of a private matter and that defendant did not seek the spread of the dispute to the public. 22 N.Y.S.3d 138 (N.Y. Crim. Ct.2015).

In short, there are too many disputed facts to allow this court to conclude, on a motion for summary judgment, that the "public harm" element of probable cause for a disorderly conduct arrest was met. The fact that Plaintiff was misbehaving in a public place—and it appears that he was—is insufficient, in and of itself, to create the risk of "public harm." The disputatious conduct to which Plaintiff admits took place in the lobby of a public hospital, at a location between the passenger elevators and the hospital exit. Defendants argue that it could easily have interfered with the movement of patients or the arrival or departure of authorized visitors, and that the noise and disruption could have interfered with the comfort of patients or the work of the staff. But there is no evidence that that was the case— especially as there exists a disputed issue of fact concerning exactly what occurred in the lobby of the hospital. And while Defendants are correct that patients and staff did not need to "flood" the lobby in order for there to be a risk for public harm, it is also not irrelevant that they did not do so. Until a trier of fact decides what the "totality of the circumstances" were, there is no way to ascertain whether the public harm element has been satisfied— either at a level of actual probable cause or even a level of arguable probable cause.

But the disorderly conduct argument is a lawyer's frolic and detour. Plaintiff was not charged with disorderly conduct; he was charged with assault. If there exists probable cause to arrest for any offense, then the arrest is lawful. Devenpeck v. Alford, 543 U.S. 146, 153 (2004); see also Jaegly

v. Couch, 439 F. 3d 149, 154 (2d Cir. 2006). So, if Officer Cardona had probable cause to arrest Thorpe for assault, then Plaintiff has no claim for false arrest.

Unfortunately, because the right questions have not been asked, the record on that score is inconclusive as well.

Officer Cardona—the actual arresting officer, the person who detained the Plaintiff so that he was not free to go—testified at his deposition that he saw Thorpe turn toward the officers several times as they were walking toward the exit and lunge in the direction of the officers while shouting obscenities. Cardona further testified that he left his post behind the lobby desk when he saw Officer Senajor's head jerk back after Thorpe lunged at Senajor, leading with his head. (Cardona EBT at 48). Cardona says he did not see exactly what occurred between the two men to cause Senajor's head to jerk back; he saw neither man actually strike the other but saw blood on Thorpe's face and hands. (EBT Tr. at 28-33). See 56.1, at ¶ 30. Cardona immediately cuffed Thorpe to a pole and placed him under arrest.

The Court does note that Cardona's EBT testimony—that he did not witness exactly what occurred—is difficult to reconcile with the lobby video, which shows him following closely behind Sergeant Joseph and Officer Senajor while those officers were escorting defendant out of the building. Perhaps the reason Cardona did not witness Plaintiff's alleged head butt of Officer Senajor or Senajor's clubbing of plaintiff in the face is because he was the officer depicted on the lobby-camera video, at 16:40:43, who turned away from the other three men to walk back to the security podium near the elevator, only to turn back and return to where his fellow officers were a few seconds later. But that is speculation on my part.

At bottom, there is nothing in the record to indicate that Cardona saw Thorpe hit Officer Senajor. Cardona was asked about the condition of Senajor's face while the officers were in the

Emergency Room (Cardona EBT at 50)—a fact salient to the malicious prosecution claim (*see* infra. at 22)—but that was long after the arrest. Nor does the video show Thorpe head butting Senajor— which, of course, does not mean that it did not happen. I cannot find in the record any testimony from Cardona about whether he observed any bruising on Senajor's face at the time he arrested the Plaintiff— not because he does not remember, but because, as far as I can tell, the question was never asked. Nor can I find any evidence about whether Cardona called Rapid Response for Senajor as well as Thorpe— again, because the question was never asked. Nor can I find any testimony about what, if anything, Senajor or Sergeant Joseph may have said to Cardona about what occurred while Cardona was heading back at his post[6]—information that might have given rise to probable cause to arrest Thorpe— again, because no one ever asked that question. If Senajor said, "He hit me," Cardona—who can rely on a report from a fellow officer—would have had probable cause to arrest Thorpe for assault, regardless of any dispute between Senajor and Thorpe over what occurred.[7] Unfortunately, that piece of the puzzle is also missing.

And, of course, Plaintiff denies that he repeatedly turned and lunged at the officers, or that he was shouting obscenities. He insists that the only thing that happened in the lobby is that Senajor pushed him, Thorpe said, "You need to keep your hands to yourself," and Senajor hit him with a baton. While he admits that he was "hot" and "upset," Thorpe insists that Senajor's attack was unprovoked.

As long as there is a disputed issue of fact about what happened in the lobby, there will be a disputed issue of fact about what Cardona saw. And that means that the claim for false arrest as

---

[6] I am prepared to assume, for purposes of the motion, that the officer who left the group and went back toward the lobby security station was the officer whose job it was to stand at the lobby security station– Cardona.

[7]"Under the fellow officer rule, a police officer can make a lawful arrest even without personal knowledge sufficient to establish probable cause, so long as the officer is acting 'upon the direction of or as a result of communication with' a fellow officer . . . in possession of information sufficient to constitute probable cause for the arrest." (People v Ketcham, 93 NY2d 416, 419 (1999), quoting People v Mims, 88 NY2d 99, 113 (1996)).

against Cardona cannot be summarily dismissed. The issue of probable cause—whether for assault or disorderly conduct—must be tried.

Cardona also argues that he is shielded from liability for false arrest by the doctrine of qualified immunity, because he had arguable probable cause to arrest Plaintiff for assault.

A law enforcement officer is entitled to qualified immunity where his actions do not violate any clearly established constitutional rights. Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014). Resolution of the "clearly established" inquiry is a legal exercise which depends on whether the officer had notice as to the constitutionality of his conduct. See Stephenson v. Doe, 332 F.3d 68, 80-81 (2d Cir. 2003). The Supreme Court has cautioned courts "not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Plumhoff, 134 S. Ct. at 2023 (internal citation omitted). A constitutional right cannot be said to be clearly established unless its contours are "beyond debate" such that "any reasonable official in the defendant's shoes would have understood that he was violating [such right]." Id. In other words, "if officers of reasonable competence could disagree, immunity should be recognized." Priolo v. City of New York (In re Estate of Priolo), 15-CV-6080 (AMD)(ST), 2019 U.S. Dist. LEXIS 54458, *9 (E.D.N.Y. Mar. 29, 2019) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Furthermore, "[f]or claims that require showing a lack of probable cause, such as false arrest and malicious prosecution, it is appropriate to grant qualified immunity to individual police officers where, 'either (a) it was objectively reasonable for the officer[s] to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Allen v. City of New York, 2006 U.S. Dist. LEXIS 22138, *6 (E.D.N.Y. Apr. 21, 2006) (quoting Walker v. Mendoza, 2000 U.S. Dist. LEXIS 8716, *7 (E.D.N.Y. June 27, 2000)). In order

16

to establish an entitlement to qualified immunity, "the officer must adduce sufficient facts that no reasonable jury, looking at the evidence in the light most favorable to...the plaintiff, could conclude that it was objectively unreasonable for the officer to believe that probable cause did not exist." Golino v. New Haven, 950 F.2d 864, 870 (2d Cir. 1991).

Looking at the evidence most favorably to the plaintiff—which is to say, discounting Cardona's testimony about the lunges and the obscenities, which Thorpe denies, and crediting Cardona's admission that he did not actually see anyone strike anyone else—genuine issues of fact preclude granting summary judgment on the issue of arguable probable cause. If Cardona is believed, then there is arguable probable cause, because some reasonable police officer who, seeing what Cardona saw, would conclude that Thorpe had assaulted Senajor, causing the latter's head to jerk backwards. But for that to be established, Cardona's story must be believed. Only a jury can make that determination.

Officer Cardona's motion for summary judgment dismissing the false arrest claim against him is, therefore, denied. [8]

However, Plaintiff's false arrest claim against Lieutenant Britto and Officer Senajor must be dismissed because they were not personally involved in his arrest.

"[A]s a prerequisite to all claims brought under Section 1983, the plaintiff must show that the defendant had personal involvement in the alleged constitutional deprivation." McNeill v. Jordan, 2017 U.S. Dist. LEXIS 107280, *11 (E.D.N.Y. July 10, 2017); see also Farrell v. Burke, 449

---

[8] Cardona argues that he is also entitled to qualified immunity on the ground that there was arguable probable cause to arrest for disorderly conduct. That, too depends on exactly what testimony is believed. If the officers are believed, then he is probably right -- See Tobias v. County of Putman, 191 F. Supp.2d 364, 374-75 (S.D.N.Y. Mar. 14, 2002) (granting qualified immunity to officers where it was reasonable for them to believe that plaintiff could be arrested for disorderly conduct where there was evidence that plaintiff behaved aggressively, used profanity, and created a spectacle). But if they are not believed, then Cardona may well not be shielded by qualified immunity. Defendants need to remember that qualified immunity must be apparent taking the plaintiff's story—not the police officers' story—as true.

F.3d 470, 484 (2d Cir. 2006). "Personal involvement may be established by a showing of direct participation, meaning 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation 'such as ordering or helping others to do unlawful acts." Id. (citing Celestin v. City of N.Y., 581 F. Supp. 2d 420, 429 (E.D.N.Y. 2008) (quoting Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001)).

It is undisputed that Lieutenant Britto was not present when Plaintiff was arrested in the hospital lobby by Officer Cardona, the person who "detained" him such that he was not "free to go." See 56.1, at ¶ 47. Additionally, she did not direct anyone to arrest Plaintiff, or have any involvement in the decision to arrest Plaintiff. (Id. at ¶¶ 48-49). In fact, Lieutenant Britto was not even aware of the arrest until she received a radio transmission from the hospital police's central command, which occurred after the arrest was made. (Id. at ¶ 31).

Plaintiff confirms that she was not present when he was arrested in the lobby as he admits that the first time he saw the lieutenant was after he was removed to the emergency room post-altercation— by which time he was already detained and not free to go. Id. at ¶ 46. The fact that the Lieutenant gave Cardona paperwork to fill out after he effected the arrest, and that she ultimately reviewed and approved that paperwork, does not mean that she was personally involved in Plaintiff's arrest.

Officer Senajor was of course involved in the events that led to Plaintiff's arrest; its immediate cause was the altercation between Plaintiff and Senajor. Moreover, Senajor testified, at Plaintiff's parole revocation hearing, that he took out his handcuffs while Thorpe was acting out— conduct that certainly admits of an inference that Senajor intended to arrest Plaintiff. (Exhibit O)

But intent is not enough. Senajor, who was injured during their altercation, did not arrest Plaintiff. He did not detain, handcuff or otherwise render Plaintiff "not free to go." He specifically

testified at the parole hearing that "the other officer"—Cardona—took Plaintiff into custody (Iheanachor Ex .O at p. 15), and there is no contradictory evidence whatever in the record. It is undisputed that Senajoar was escorting Thorpe out of the hospital, and that Plaintiff was not under arrest at that time. It was Officer Cardona who placed Plaintiff against a pillar and handcuffed him. Id. at ¶¶ 23, 28.  Officer Cardona took the Plaintiff into custody, while Officer Senajor was sent to the emergency room. Officer Cardona completed the arrest paperwork and transported plaintiff to Central Booking, while Officer Senajor was being treated for the injuries he claims to have received during his physical altercation with Plaintiff— injuries that Officer Cardona saw in the emergency room.

So, whatever he might have intended to do, Officer Senajor did not arrest the Plaintiff. (Id. at ¶¶ 34-36).

### 3. DEFENDANTS SENAJOR, BRITTO AND CARDONA ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIM FOR MALICIOUS PROSECUTION

Plaintiff's New York state law claim for malicious prosecution against Officers Senajor and Lieutenant Britto must be dismissed because he has not raised any genuine issue of fact that either of those officers initiated or continued his prosecution, or if they did, that they did so with malice and without probable cause. [9] (SAC, Eighth Cause of Action).

To prevail on a claim for malicious prosecution under New York law, "a plaintiff must show: (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." Droz v. McCadden, 580, F.3d 106, 109 (2d Cir. 2009) (quoting Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003)).

As to defendants Britto and Senajor, plaintiff cannot satisfy the initiation or continuation prong of the standard. Britto did not execute the criminal court complaint, or have any contact with the District Attorney's Office, or testify at any hearing or procedure— in short, she had no personal involvement in the prosecution at all. See 56.1 at ¶¶ 50-54.

To the extent Plaintiff suggests that Britto is liable for malicious prosecution for reporting Plaintiff's curfew violation and arrest to his parole officer—which gave rise to probable cause to violate him for not abiding by the conditions of parole—a claim for malicious prosecution is doubly deficient. First, there is no evidence that Britto did anything but transmit information about Plaintiff

---

[9] Plaintiff does not appear to be alleging a federal malicious prosecution claim. If he did, it meets with the same fate as the state law claims, principally because there was no "favorable termination" of the criminal matter in Plaintiff's favor, as required to hold someone liable for malicious prosecution under Section 1983. A termination on speedy trial grounds is not a "favorable termination." Lanning v. City of Glen Falls, 908 F.3d 19, 35 (2d. Cir. 2018). This means that no federal malicious prosecution claim can proceed against Britto, Senajor, or Cardona.

to the parole officer; no evidence that she directed, advised or encouraged the parole officer to make the decision to violate Plaintiff, let alone that she had the power to do so. Second, the parole revocation proceedings did not terminate in Plaintiff's favor, which is an automatic bar to any sort of malicious prosecution claim. After a preliminary hearing, the hearing officer found probable cause to believe that Plaintiff had attacked Officer Senajor and put the matter over for a final hearing (Exhibit O); eventually he was issued a parole violation for breaking curfew (Iheanachor, Exhibt K), which he indisputably did. The charges against him were not dismissed on the merits.

Senajor did not execute the criminal court complaint, and there is no evidence that he ever communicated with the prosecutor or encouraged the prosecutor to move forward with the criminal prosecution. See Manganiello v. City of New York, 612 F.3d 149, 163 (2d Cir. 2010) (finding initiation element satisfied where an officer gave advice and encouraged the authorities to act); see also Barone v. United States, No. 12 iv. 4103 (LAK), 2014 U.S. Dist. LEXIS 117638, 2014 WL 4467780, at *17 (S.D.N.Y. Sept. 10, 2014). Nor did Senajor testify at any criminal court proceeding (as opposed to Plaintiff's parole revocation hearing). Id. at ¶ 35. Thus, there is no claim for malicious prosecution against Senajor.

And regardless of the fate of the false arrest claim against Cardona, there is no basis on which a malicious prosecution claim can go forward against him either. While there is a dispute over what happened in the lobby of the hospital, there is no dispute over the fact that Senajor was taken to the Emergency Room with a visibly injured face. (See Exhibit J) (depicting bruising and cuts around Senajor's eyes and forehead). Although Thorpe denies having struck the officer ((Thorpe Deposition at 26), the condition of Senajor's face shortly after the incident, without more, is enough to establish probable cause to swear out a complaint for assault. (See N.Y. Penal Law 120.05(3) (with intent to prevent a peace officer from doing job, defendant causes physical injury to officer)). As for malice,

Plaintiff offers nothing more than rank speculation about Cardona's motives. That is not enough to defeat a motion for summary judgment.

### 4. DEFENDANT BRITTO IS ENTITLED TO SUMMARY JUDGMENT DISMISSING ANY CLAIMS AGAINST HER FOR EXCESSIVE FORCE, ASSAULT AND BATTERY, OR FAILURE TO INTERVENE

The Second Amended Complaint alleges claims against Officer Cardona and Lieutenant Britto for excessive force, assault and battery, and failure to intervene. [10] (SAC, Fifth, Sixth and Seventh Causes of Action).

There is no evidence that Lieutenant Britto laid a hand on Plaintiff, so she cannot be held liable to him for either the application of excessive force or for assault and battery. The Second Circuit does not recognize a claim for excessive force where no physical contact occurred between an officer and an arrestee. See Easton v. City of New York, 2009 U.S. Dist. LEXIS 53519, *4 (E.D.N.Y. June 23, 2009); see also Sherman v. Platosh, 2017 U.S. Dist. LEXIS 35089, *7 (D. Conn., Mar. 13, 2017). Moreover, Britto was not present when the allegedly excessive force was applied, so she cannot be held liable on a theory of failure to intervene. Counts Five, Six and Seven are dismissed as against her.

As to Officer Cardona, he is not alleged to have assaulted plaintiff or to have used excessive force on plaintiff. However, contrary to his deposition testimony, the lobby video shows him at times shoulder to shoulder with his fellow officers, Joseph, and Senajor. If the ultimate finder of fact (the jury) were to determine that Senajor struck Plaintiff without provocation, it might also find—depending on how the facts unfold at trial—Cardona liable for failing to intervene to prevent the

---

[10] "[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical." Humphrey v. Landers, 344 Fed. Appx. 686, 688 (2d Cir. 2009) (quoting Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991)).

assault. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Morris v. City of New York, 14 CV 1749 (JG) (LB), 2015 U.S. Dist. LEXIS 54550, *12 (E.D.N.Y. Apr. 27, 2015) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases)). "An officer who fails to intervene is liable for the preventable harm caused by other officers where that officer observes or has reason to know that other officers have committed a constitutional violation, including the use of excessive force or unjustifiable arrest." Id. at *12-13. "For liability to attach, 'there must have been a realistic opportunity to intervene to prevent the harm from occurring.'" Id.

Viewing the facts most generously to Plaintiff, Officer Cardona could have been in the immediate vicinity when Officer Senajor hit Plaintiff in the eye, and that attack could have been without provocation. Thus, it is possible the jury might find that Officer Cardona had a realistic opportunity to prevent Senajor from striking Plaintiff.

And under such a generous view of the facts, Cardona is not entitled to qualified immunity, as no reasonable police officer would believe that—given the opportunity—failing to stop a fellow police officer's unprovoked assault on a citizen did not violate that citizen's constitutional rights.

### 5. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING THE THE CONSPIRACY CLAIM AS THERE IS NO VIEW OF THE EVIDENCE TO SUPPORT IT

In his Ninth Cause of Action, Plaintiff alleged that Officers Senajor and Cardona and Lieutenant Britto entered into a conspiracy to deprive him of his civil rights under federal law. The Defendants are entitled to summary judgment dismissing this claim.

To establish a claim under § 1985(3), plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection

of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." Marshall v. Port Auth. of N.Y. & N.J., 2020 U.S. Dist. LEXIS 172567, *24 (S.D.N.Y. Sept. 21, 2020) (quoting Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087-88 (2d Cir. 1993)).

Here, no view of the evidence supports the existence of any conspiracy. There is absolutely no evidence in the record from which a trier of fact could conclude that "such that defendants entered into an agreement, express or tacit, to achieve the unlawful end" and that the officers took any steps in furtherance of their alleged agreement. Marshall, at *25 (quoting Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (quotation marks omitted). No record evidence indicates what the defendants purportedly conspired to do, when they formed their alleged agreement, or what specific actions were taken by each to further the aims of the conspiracy.

Plaintiff speculates that, because the officers spoke in the emergency room, they must have cooked up a plot to frame him. But that is all plaintiff offers— speculation. Without actual evidence that the officers discussed making up a story to frame the plaintiffs—and there is none—Plaintiff raises no genuine issue of fact as to the existence of a conspiracy. Therefore, Plaintiff's claim is dismissed. Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007) (granting summary judgment where there was no evidence of a conspiracy).

### 6. THE CITY OF NEW YORK IS ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S "MONELL" CLAIM

Plaintiff's Third cause of action purports to state a claim for "Monell" liability against defendants City and/or Health and Hospitals Corporation.[11]

---

[11] Monell v. Department of Social Services, 436 U.S. 658 (1978).

"[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth., 615 F.3d 129, 140 (2d Cir. 2010) (quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 51, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).

When Monell liability is predicated on deliberate indifference, the Plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Wray v. City of New York, 490 F.3d 189, 196 (2d Cir. 2007). "[A] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, 563 U.S. at 62. (quoting Bd. Of Cty Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). Here, the Plaintiff pleads, in purely conclusory fashion, that the City has failed to train and supervise its police officers in an adequate manner and so was deliberately indifferent to the possibility that a citizen's constitutional rights might be violated.

Finally, if the plaintiff lacks a viable claim for an underlying constitutional violation, his municipal liability claim must be dismissed, as "[d]efendants cannot be liable where there is no underlying constitutional violation." Worrell v. City of New York, 2014 U.S. Dist. LEXIS 39794, *35 (E.D.N.Y. Mar. 24, 2014) (citing to Johnson, 551 Fed. Appx. at *15). Here that rule does not come into play, because the Plaintiff has adduced enough evidence to take his claim against Officer Cardona for false arrest and failure to intervene, and against Officer Senajor for assault and excessive

force to a jury. However, he has adduced no evidence to indicate that the incident underlying his claim occurred as a result of any specific custom, policy, or practice of the City of New York. "A single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show municipal liability." Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991). That is all we have here.

And to the extent Plaintiff seeks to hold the City liable on a failure to train or supervise claim, that effort ends here, because he took no *Monell* discovery and has adduced absolutely no evidence of any failure to train Officers Senajor or Cardone. See Anderson v. City of New York, No. 15-CV-6246 (AJN), 2017 U.S. Dist. LEXIS 168332, *12 (S.D.N.Y. Sep. 25, 2017) (summary judgment granted where plaintiff did not conduct Monell discovery); Morgan v. Nassau County, 03 CV 5109, 2009 U.S. Dist. LEXIS 79180, *44 (E.D.N.Y. Sept. 2, 2009) (plaintiff could not solely rely on his allegations in the pleadings to defeat summary judgment).

### 7. PLAINTIFF'S STATE LAW NEGLIGENCE CLAIM IS INCONSISTENT WITH HIS EXCESSIVE FORCE CLAIM

Plaintiff admits that his state law negligence claim is not viable, in the face of Defendants' arguments that (1) Senajor cannot be held liable for negligence when the conduct alleged against him constitutes an intentional tort; and (2) any such claim is barred as a matter of law, since, "It is well established that 'a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution.'" Fiedler v. Incandela, 222 F. Supp. 3d 141, 167 (E.D.N.Y. Dec. 6, 2016), (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). See Br. In Opp at 23.

The claim is dismissed.

### 8. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S STATE LAW NEGLIGENT TRAINING AND SUPERVISION CLAIM

Plaintiff alleges that defendants City of New York and NYCHHC negligently failed to adequately train and supervise their employees, including Officers Senajor and Cardona and Lieutenant Britto, directly causing injury to Plaintiff (SAC, Second Cause of Action). Under New York law, a plaintiff must identify the "laws, rules, regulations, and best practices standards that defendant allegedly violated" in order to sustain a claim for negligent training and supervision. Dobroshi v. Bank of Am., N.A., 886 N.Y.S.2d 106, 109 (1st Dept 2009). Plaintiff has not identified any specific rules, regulations, or policies that the municipal defendants allegedly violated.

The claim is dismissed.

### 9. THE MUNICIPAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIM FOR NEGLIGENT HIRING

Plaintiff's Fourth cause of action is for negligent hiring. "To make out such a claim, a plaintiff must show, 'in addition to the standard elements of negligence...(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury...; and (3) that the tort was committed on the employer's premises or with the employer's chattels." Albert v. City of New York, 2018 U.S. Dist. LEXIS 179576, *39 (E.D.N.Y. Oct. 18, 2018) (quoting Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004)). "A necessary element of causes of action for negligent hiring, retention, and supervision 'is that the employer knew or should have known of the employee's propensity for the conduct which caused the injury.'" Estevez-Yalcin v. Children's Vill., 33 F. Supp. 2d 170, 176 (S.D.N.Y. Aug. 11, 2004) (quoting Kenneth R. Roman Catholic Diocese, 229 A.D.2d 159, 654 N.Y.S.2d 791, 793-94 (App. Div. 1997)).[12]

In addition to the fact that the City owed no special duty to Plaintiff separate and apart from other citizens (one of the basic elements of any negligence claim, (see McLean v. City of New York 12 N.Y.3d 194, 199 (2009)), Plaintiff has adduced no evidence tending to show, that Officer Senajor or Cardone had any tendency toward the use of excessive force or to assault persons without provocation.

Therefore, Plaintiff's claim for negligent hiring is dismissed.

---

[12] See Gomez v. City of New York, 304 A.D.2d 374, 758 N.Y.S.2d 298, 299 (App. Div. 2003); Oliva v. City of New York, 297 A.D.2d 789, 748 N.Y.S.2d 164, 166 (App. Div. 2002).

## CONCLUSION

All claims against defendants NYPD and Harlem Hospital are dismissed because they are not suable entities.

The false-arrest claims against Lieutenant Britto and Officer Senajor are dismissed because neither Britto nor Senajor arrested plaintiff.

The false arrest claim against the arresting officer, Officer Cardona, is NOT dismissed.

The malicious prosecution claims against Britto, Senajor, and Cardona are dismissed

The excessive force claim against defendant Britto is dismissed because she did not use any force against plaintiff, and (2) she cannot be said to have failed to intervene in any use of force since she was not in the vicinity of the force when it occurred and/or had a realistic opportunity to intervene.

The excessive force claim against defendant Cardona is NOT dismissed since he was in the vicinity of the force when it occurred and may have had a realistic opportunity to intervene.

Plaintiff's conspiracy claim fails because he has not established the existence of a conspiracy between the defendant officers.

Plaintiff's federal municipal liability claim based on a failure to train and supervise theory fails because he has not identified a failure in the City's training or supervision.

Plaintiff's negligence claim is dismissed since he cannot pursue both a negligence and excessive force claim predicated on the same allegedly intentional conduct.

Plaintiff's state-law claim for failure to train and supervise is dismissed for Plaintiff's failure to identify any rule or regulation set forth by the municipal defendants that their employees violated.

Finally, Plaintiff's claim for negligent hiring is dismissed.

Given the foregoing: Plaintiff and Defendants Senajor, Cardona, and Joseph are to file an amended Final Pretrial Order addressing only the claims that remain and the evidence needed to prove them.

The Court will hold a final pretrial conference on October 21 at 11:00 a.m.

The court will request a trial date commencing in the first quarter of 2022 or will set a trial date as soon as the current limitations on judicial control of calendars, necessitated by the pandemic, are lifted.

This constitutes the written opinion of the Court.

The Clerk of Court shall remove the motion at Docket #82 from the court's list of open motions.

Dated: August 25, 2021

_____
U.S.D.J.

BY ECF TO ALL COUNSEL